Filed 2/29/16  Lepore v. Kelsey-Hayes Co. CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| GERALDINE BIERNER LEPORE et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> KELSEY-HAYES COMPANY et al., <br><br> Defendants and Respondents. | A137451 <br><br> **ORDER DENYING PETITION FOR REHEARING AND MODIFYING OPINION** <br><br> (San Francisco County <br> Super. Ct. No. CGC09275411) |

THE COURT:

Defendant Navistar, Inc.'s February 23, 2016 petition for rehearing is denied. Further, the opinion is ordered modified as follows:

The second paragraph on page 11 (beginning with "Villegas testified that the Port had a 'consistent' policy of using OEM products . . .") should be deleted in its entirety.

The last paragraph beginning on page 24 and ending on page 25 (beginning with "Plaintiffs met their burden. . .") should be replaced with the following paragraph:

"Plaintiffs met their burden.  In opposition to Navistar's motion, they presented evidence that International and Navistar were among the manufacturers and suppliers of vehicles, equipment, and replacement parts used in the CED, that the CED serviced heavy trucks, construction equipment, and dump trucks made by International, that approximately a third of the dump trucks in the Port's training fleet were made by International Harvester, and that the Port received replacement brakes from Navistar on 'a lot' of occasions.  There was also evidence that brake work was done 'all the time'

1

while Roman and Lepore were present, and Roman testified directly that he saw brake work done on wheeled International equipment in Lepore's presence in the CED between 1974 and 1983."

There is no change in judgment.

Dated: _____                    _____, P.J.

Filed 2/8/16  Lepore v. Kelsey-Hayes Co. CA1/4 (unmodified version)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| GERALDINE BIERNER LEPORE et al., Plaintiffs and Appellants, v. KELSEY-HAYES COMPANY et al., Defendants and Respondents. | A137451 (San Francisco County Super. Ct. No. CGC09275411) |

Plaintiffs[1] appeal after the trial court granted summary judgment to defendants Ford Motor Company (Ford), Navistar, Inc. (Navistar), Gibbs International, Inc. (Gibbs), and Kelsey-Hayes Company (Kelsey-Hayes) (collectively, defendants) in this wrongful death action based on Lepore's exposure to asbestos.  They contend the trial court erred in granting summary judgment and in excluding evidence submitted in support of their motion for a new trial.  We shall reverse the judgments as to Ford, Navistar, and Kelsey-Hayes and affirm the judgment as to Gibbs.

## I.  STANDARD OF REVIEW OF SUMMARY JUDGMENT

"We review a grant of summary judgment de novo.  [Citation.]  In performing our de novo review, we employ a three-step analysis.  'First, we identify the issues raised by the pleadings.  Second, we determine whether the movant established entitlement to

---

[1] The named plaintiffs are Geraldine Bierner Lepore, individually and as successor-in-interest to decedent Gene Lepore, Kristin Marie Reinholz, and Michael James Lepore.  Decedent Gene Lepore was the original plaintiff in this action.  References herein to "Lepore" are to decedent Gene Lepore.

1

summary judgment, that is, whether the movant showed the opponent could not prevail on any theory raised by the pleadings.  Third, *if the movant has met its burden*, we consider whether the opposition raised triable issues of fact.'  [Citations.]  To shift the burden, the defendant must conclusively negate a necessary element of the plaintiff's case or demonstrate there is no triable issue of material fact requiring a trial.  [Citation.]  If the evidence does not support judgment in the defendant's favor, we must reverse summary judgment without considering the plaintiff's opposing evidence.  [Citation.]  Any evidence we evaluate is viewed in the light most favorable to the plaintiff as the losing party; we strictly scrutinize the defendant's evidence and resolve any evidentiary doubts or ambiguities in the plaintiff's favor.  [Citation.]"  (*Barber v. Chang* (2007) 151 Cal.App.4th 1456, 1462–1463 (*Barber*).)

Thus, in considering a motion by a defendant, " ' we determine with respect to each cause of action whether the defendant seeking summary judgment has conclusively negated a necessary element of the plaintiff's case, or has demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial . . . .'  (*Guz*[ *v. Bechtel National, Inc.* (2000)] 24 Cal.4th [317,] 334.)  [A defendant bears] the burden 'to make a prima facie showing of the nonexistence of any triable issue of material fact; *if he carries his burden of production, he causes a shift*, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact.'  (*Aguilar*[ *v. Atlantic Richfield Co.* (2001)] 25 Cal.4th [826,] 850 [(*Aguilar*)], italics added.)"  (*Hawkins v. Wilton* (2006) 144 Cal.App.4th 936, 940; see also *Binder v. Aetna life Ins. Co.* (1999) 75 Cal.App.4th 832, 840 [responding plaintiff has no evidentiary burden unless moving defendant has first met initial burden].)  In order to meet its burden on a claim for which the plaintiff would have the burden of proof by a preponderance of the evidence, "the defendant must present evidence that would preclude a reasonable trier of fact from finding that it was more likely than not that the material fact was true [citation], or the defendant must establish that an element of the claim cannot be established, by presenting evidence that the plaintiff 'does not possess and cannot reasonably obtain, needed evidence.' " (*Kahn*

2

*v. East Side Union High School Dist*. (2003) 31 Cal.4th 990, 1003; and see *Aguilar*, 25 Cal.4th at p. 850.)

Plaintiffs contend defendants' motions for summary judgment were insufficient to show entitlement to summary judgment, that is, to shift the burden to plaintiffs; they also contend they presented evidence that raised a triable issue of material fact as to each defendant.

## II.  BACKGROUND

The operative complaint in this action alleged that Lepore was exposed to asbestos at his workplace and that as a result he contracted mesothelioma and died of it.  Plaintiffs asserted causes of action for negligence (wrongful death), strict liability, products liability, survivorship, and loss of consortium against multiple defendants.  Motions for summary judgment brought by four of those defendants are at issue in this appeal.

None of the defendants disputed that Lepore had been exposed to asbestos during the course of his work.  All four motions relied on the theory that there was no admissible evidence that the products they supplied, distributed, or sold were a source of that exposure.

### A.  Evidence in Support of Ford's Motion

Lepore was a civilian employee at the Naval Construction Battalion Center at Port Hueneme (the Port) beginning in 1974.  His job was to identify training needs for all personnel at Port Hueneme, including trades people, supervisors, and management, and to locate training programs to meet those needs.  He was not a mechanic.  His office was in the Port's main administration building, about half a mile from the Construction Equipment Division (CED), where all vehicle repair work was performed.  When Lepore was choosing training programs, he would go to the CED while mechanics were performing their work.  That work included working on vehicles' brakes.  Vehicles had their brakes "arced" or "grinded" in the brake shop area.

Donald Bangs, a heavy equipment mechanic at Port Hueneme,[2] testified that mechanics in the CED performed any type of repair that a vehicle, truck, or piece of heavy equipment needed, including changing engine and transmission oil; lubricating wheel bearings; working on radiators, hoses, thermostats, fans, belts, water pumps, alternators, generators, regulators, and starters; inspecting and repairing fuel systems, carburetors, and injectors; changing spark plugs and batteries; doing smog work and body work; and replacing and repairing wiring. Bangs could not specify any piece of equipment upon which work was performed in Lepore's presence. A variety of passenger cars and trucks were repaired in the CED; Bangs recalled sedans and light trucks made by Ford, Chevrolet, Chrysler, and GMC, medium trucks made by Ford and Chevrolet, and heavy trucks made by Ford, Chevrolet, International, White, Freightliner, Kenworth, and Peterbilt. Mechanics worked on forklifts made by Yale, Case, Crown, Hyster, and Clark, trailers made by Fruehauf and Lowboy, construction equipment made by Caterpillar, International, John Deere, Euclid, and Terex, and cranes made by P&H, Linkbelt, Grainger, and Grove. A variety of brands of brakes were used in the building, including Bendix, Rockwell, American Block, EIS, and Grizzly.

According to the deposition of Robert Bailey, who worked in the CED's purchasing department from about 1975 and 1995, replacement parts came not only from original equipment manufacturers (OEM's), such as Ford or Dodge, but from aftermarket manufacturers. The CED used replacement brakes or brake linings made by Raybestos, Ford, Dodge, Mopar, Delco, Borg-Warner, Apex, International, John Deere, Clark, Hyster, and Wagner, clutches made by Borg-Warner, Spicer, International, and Allison, and gaskets made by Fel-Pro, Gates, Onan, International, and Cummins.

In his deposition, Lepore was asked if he could recall the make and model of any particular vehicle on which he saw brake work performed. He responded, "[O]n any given day it could have been any one of the products." He never stayed to watch a brake job from start to finish. He also testified that he did not know the brand name or

---

[2] Bangs was a mechanic in the CED beginning in 1970, and later held a variety of jobs, including shop division director, a position he held until 1997.

manufacturer of any brakes he saw removed and that he did not know who supplied the brakes on any vehicles he saw repaired. He testified that he saw mechanics modify, sand, grind, or abrade clutches, but could not identify the brand names of any products he saw used. He saw mechanics removing gaskets on heavy trucks or heavy equipment, but could not recall the brand name or manufacturer of any gasket he saw removed, did not recall power tools being used to remove them, and did not know if the gaskets were original to the vehicles.[3]

Lepore's colleague Vince Roman testified that he could not identify the model, year, or maintenance history of any Ford vehicle that he and Lepore saw while brake, clutch, or engine work was being done on it. Nor could he say whether any of the equipment that was removed was original to the vehicle.

Ford propounded special interrogatories to plaintiffs. Its first interrogatory asked plaintiffs to state each fact supporting their contention that Lepore was exposed to asbestos-containing products marketed by Ford. As pertinent to the question of whether Ford products were the source of Lepore's exposure to asbestos, plaintiffs' response stated: "Decedent, Gene Lepore, was exposed to asbestos dust from asbestos-containing original equipment manufactured, distributed and sold by Ford Motor Company ("Ford"), including but not limited to sedans, light trucks, heavy trucks, trailers, and other heavy equipment which contained asbestos containing brake assemblies, clutch components and gaskets, through his work at Port Hueneme from approximately 1974 through the late 1990s. Decedent was present while workers in the Construction Equipment Department ("CED") removed, installed, repaired and otherwise disturbed Ford original equipment friction materials, including but not limited to brakes, clutches and gaskets. The asbestos containing replacement parts used by the CED workers on the Ford original equipment were distributed and supplied by Ford. For additional details, Plaintiffs refer defendant to

---

[3] There appears to be no dispute that asbestos is released when certain tasks, such as arcing or grinding, are performed on asbestos-containing brakes, clutches, and gaskets.

5

the deposition of Gene Lepore, taken March 2–6, 2010 and the deposition of Bob Bailey, taken April 28–29, 2010 and June 28–29, 2011."[4]

In response to interrogatories that asked them to identify all persons with knowledge that Lepore was exposed to asbestos-containing products marketed by Ford and to state all pertinent facts known to them, plaintiffs named Robert Bailey, Donald Bangs, and Antonio Villegas, and continued, "Plaintiffs cannot tell you everything that the witnesses know, as they have not yet been deposed and have not yet been fully interviewed. They are expected to identify FORD equipment. [¶] Beyond this, Plaintiffs have no information about persons having relevant knowledge other than those persons mentioned at prior depositions. Discovery and investigation are continuing."

Another interrogatory asked plaintiffs to identify each document supporting their contention that Lepore was exposed to asbestos-containing products marketed by Ford. Plaintiffs' response first noted that Ford was aware of documents indicating that Ford's products contained asbestos, then went on to identify the depositions of Lepore, Bailey, and Mark Taylor, without specific page references.[5] Plaintiffs concluded by saying "Discovery and investigation are continuing."

The interrogatories asked plaintiffs to identify each Ford vehicle on which asbestos-containing products were installed or removed and to which Lepore was

---

[4] The remainder of the response states that Ford had admitted that its equipment included asbestos-containing brake assemblies, clutch components, and gaskets, and that it distributed and supplied asbestos-containing replacement parts, that Ford was liable because it installed asbestos-containing brakes and that it knew they were dangerous, that Ford designed the brakes in a manner that required workers to encounter asbestos during repair work, that it required asbestos replacement brakes, and that it did not recommend or require its users to take precautions against asbestos. The factual question at issue in connection with Ford's motion for summary judgment is not whether its products contained asbestos or whether work on them entailed exposure to asbestos, but whether Lepore was exposed to asbestos from Ford products in the course of his work.

[5] The reference to Mark Taylor stated: "Depositions of Mark Taylor, including that taken on August 26, 2008, in *Clawson v. AC and S, Inc. et al.*" There is no indication Taylor (apparently an employee of Ford) provided information pertinent to the question of whether Lepore was present when asbestos was released from Ford products.

exposed, and to describe each asbestos-containing product marketed by Ford to which Lepore was exposed during installation or removal.  Plaintiffs identified the vehicles as "Ford vehicles, light trucks, heavy trucks, trailers, and other heavy equipment," and the products as "asbestos containing brake assemblies, clutch components and gasket materials distributed and sold by Ford and asbestos containing replacement brake, clutch and gasket materials supplied by Ford."  Each response concluded, "Discovery and investigation are continuing."

None of the remaining interrogatory responses provided facts supporting a contention that Ford products were a source of asbestos to which Lepore was exposed at Port Hueneme.

## B.  Plaintiffs' Evidence in Opposition to Ford's Motion

Plaintiffs submitted evidence that mechanics at Port Hueneme serviced vehicles every weekday and some Saturdays.  Beginning in the early 1970's, about 150 to 250 vehicles per month were serviced in the CED; "later on," between 85 to 150 pieces of equipment were worked on each day.  The Seabee school at the Port had a fleet of about 300 vehicles, and the mechanics at the CED repaired and "rebrake[d]" the vehicles.  The vehicles would be phased out and replaced with new vehicles every few years.  OEM replacement parts were used on the vehicles in the fleet most of the time.  Suppliers of replacement parts included Quinn, Gibbs, Catlin's, NAPA, Oxnard Auto Parts, Camarillo Auto Parts, Detricks, Ford, General Motors (GM), Chrysler, and International.  Bailey recalled receiving clutches from a number of makers between 1978 and 1986, including Ford.  According to Bailey, if Port Hueneme "ordered a stock number that related to Dodge, for example, we would get Dodge parts.  [¶] If it was Ford, we'd get Ford parts."

Some of the vehicles in Port Hueneme's fleet were Fords.  Lepore recalled Ford sedans and pickups in the fleet, but could not estimate what percentage of the fleet were Fords.  Bangs testified that a number of makes of vehicles, including Ford sedans, light trucks, medium trucks, and heavy trucks, underwent work in the CED.

Bangs testified in his deposition that he would see Lepore in the CED while vehicles underwent work.  The mechanics would use compressed air to begin cleaning

7

the brake assemblies, making the air dusty. This would occur every day. Some dust was left on the work surfaces of the shop. Bangs testified that Lepore would be in the area when mechanics used compressed air to clean brake assemblies within a few feet of him. The mechanics did not stop their work when Lepore was present. According to Bangs, it was common to see Lepore in the vicinity when brakes, clutches and gaskets were removed and replaced on Ford vehicles.

Plaintiffs' evidence showed that Lepore visited the CED frequently. Lepore testified that he was there every other day when he began working at Port Hueneme, and that mechanics frequently performed maintenance and repair work in his presence, including brake work. Bangs testified that Lepore visited the CED two or three times a week during the 1970's and 1980's, and Roman testified that he and Lepore were "continuously" in the CED and that he was present with Lepore when brake work was being done on Ford vehicles.[6]

## C. Evidence in Support of Navistar's Motion[7]

Navistar is a manufacturer of trucks and construction equipment. Plaintiffs alleged, and Navistar does not dispute, that Navistar is the successor in interest to International Harvester Company and/or the International Truck and Engine Corporation (sometimes referred to as International) and that it is liable for International's acts and

---

[6] Plaintiffs also submitted an expert declaration of Rudy Limpert, Ph.D., a mechanical engineer. Dr. Limpert opined that virtually all American cars built before 1980 had rear drum brakes, that non-asbestos lined brake shoes were not generally commercially available at the time, and that until approximately 1990, Ford vehicles with rear drum brakes were designed to contain asbestos-lined brake shoes and were required to use asbestos-containing replacement materials. As we will discuss below, the trial court sustained Ford's objections to much of Dr. Limpert's declaration.

[7] Except as necessary to understand Navistar's motion, we will not repeat evidence that is duplicative of evidence submitted in support of Ford's motion.

omissions. The CED serviced heavy trucks and construction equipment manufactured by International.[8]

Lepore recalled seeing mechanics in the CED perform brake, clutch, and gasket work, but that he could not identify any particular make and model of vehicle, and could not identify the manufacturer of any components he saw removed or installed. He did not recall whether he had seen work performed on an International vehicle. He did not have any information about the prior maintenance history of International Harvester trucks he saw at Port Hueneme, or whether the brake systems, clutches, or gaskets were original to the trucks.

Bangs testified that he could not identify the make, model, brand, manufacturer, or supplier of any vehicle or piece of equipment he was working on when Lepore was present. Many types of vehicles and construction equipment, made by many different manufacturers (including International), were repaired at the CED. Replacement parts came from many different manufacturers. Bangs recalled brakes manufactured by Bendix, Rockwell, American Block, Wagner, EIS, Rayblok or Raybestos, Grayblock or Graystone, and Grizzly. He recalled replacement clutches made by Spicer, Borg-Warner, Wagner, Bendix, and Graystone, and replacement gaskets made by Victor, Fel-Pro, and Cummins. Bangs also recalled other suppliers of replacement parts and materials for Port Hueneme: Quinn, Gibbs, Catlin's, NAPA, Oxnard Auto Parts, Camarillo Auto Parts, Detricks, Ford, GM, Chrysler, and International.

Bailey walked through the garage with Lepore on various occasions, but could not recall specific products that were being used at the time. He sometimes bought aftermarket brakes, clutches, and gaskets for International vehicles. There were weeks when Lepore visited the CED three, four, or five times, and there were also stretches when he did not visit for as much as a month.

---

[8] Bangs testified that the range of "heavy equipment" included two-and-a-half ton trucks, five-ton trucks, ten-ton dump trucks, twenty-ton dump trucks, graders, bulldozers, front-end loaders, compactors, ditch diggers, asphalt paving machines, and steam cleaners.

Lepore's colleague, Roman, testified the he could not identify by make, model, and maintenance history any International vehicle he saw undergoing brake work, clutch work, or engine work that involved gaskets while he and Lepore were present. He did not know if the material he saw removed was original to the vehicle. He did not recall seeing boxes from International with brakes, clutches, or gaskets at the CED when he was with Lepore.

Navistar propounded written discovery to plaintiffs seeking all facts supporting their contention that Lepore was exposed to asbestos-containing products marketed by Navistar and each person with knowledge of those facts. In their interrogatory responses, plaintiffs stated, "Decedent, Gene Lepore, was exposed to hazardous asbestos dust from asbestos-containing Navistar, Inc., as successor in interest to International Harvester (hereinafter 'Navistar'), original equipment, including but not limited to pickup trucks, heavy duty trucks, trailers, and construction equipment, through his work at Port Hueneme from approximately 1974 through the late 1990s. Decedent was present while workers in the Construction Equipment Department ('CED') removed, installed, repaired and otherwise disturbed Navistar original equipment friction materials, including but not limited to asbestos-containing brakes, clutches and gaskets. The asbestos-containing replacement parts used by the workers on the Navistar original equipment were distributed and supplied by Navistar." Plaintiffs identified Bailey and Bangs as those with knowledge supporting their contention that Lepore was exposed to Navistar's asbestos-containing products. Navistar later propounded supplemental discovery asking plaintiffs to review their interrogatory responses and update them. In February 2011, plaintiffs responded that Lepore was regularly present in the CED when repair work on Navistar equipment and vehicles was performed, including brake work, that the vehicles and equipment were purchased new and the mechanics used asbestos-containing OEM replacement parts, and that mechanics worked on Navistar vehicles in Lepore's presence removing Navistar-supplied asbestos-containing parts. Plaintiffs identified Bailey, Bangs, and Roman as witnesses who testified to these facts.

### D. Plaintiffs' Evidence in Opposition to Navistar's Motion

In opposition to Navistar's motion, plaintiffs submitted excerpts from Bangs's deposition, in which he testified that vehicles and construction equipment made by Ford, International Harvester, Caterpillar, John Deere, Grove, Hyster, P & H, Linkbelt, Euclid, Terex, Ford, and GMC were repaired in the CED, where Lepore visited. Replacement parts were supplied by Quinn, Gibbs, Catlin's, NAPA, Oxnard Auto Parts, Camarillo Auto Parts, Detricks, Ford, GM, Chrysler, and International. Bangs testified that International Harvester or Navistar-branded replacement brakes, clutches, and gaskets were used at Port Hueneme, but acknowledged that he had not seen the packaging for the brakes or clutches and that non-OEM replacement brakes could be used on International equipment. The training fleet at Port Hueneme included between 15 and 20 dump trucks, of which approximately a third were made by International Harvester.

Villegas testified that the Port had a "consistent" policy of using OEM products on heavy equipment, such as construction equipment, cranes, dump trucks, large trailers, and off-road equipment between the early 1970's and 1984. International manufactured wheeled heavy-duty equipment such as 20-ton truck tractors and scrapers.

Roman testified that brake jobs were performed "all the time" when he and Lepore were present, and that he saw brake work done on International equipment while he and Lepore were present in the CED. He associated International with construction equipment such as scrapers, graders, and bulldozers, and also recalled large International pickup trucks.

Bailey testified that between 1978 and 1986, he ordered brake linings and clutches from a number of manufacturers, including International. On "a lot" occasions, the Port received replacement brakes from Navistar.

### E. Gibbs's Motion for Summary Judgment

Gibbs acknowledges that it sold to the Port some of the replacement parts for Navistar vehicles. In its motion for summary judgment, Gibbs relied on much of the same evidence relied upon by Ford and Navistar, which we have recited above. In addition, Gibbs submitted evidence that Bailey testified that he did not know how often

11

he bought brakes for Navistar vehicles from Gibbs, that he could not say whether Lepore was ever present when one of those brakes was installed on a Navistar vehicle, that he could not identify a vehicle or vehicles for which he obtained supplies at Gibbs, that he did not recall obtaining clutches for Navistar vehicles from Gibbs, and that he could not recall any specific type of gasket he obtained from Gibbs.

Roman did not know the source of the replacement parts used in the CED. He did not know the brands of any replacement parts he saw installed when he was with Lepore, and did not recall seeing boxes from International with a brake, clutch, or gasket while he was with Lepore.

## F. Plaintiffs' Evidence in Opposition to Gibbs's Motion

In addition to evidence they submitted in response to the motions for summary judgment we have previously discussed, plaintiffs submitted evidence that Gibbs sold automotive replacement parts that may have included asbestos-containing brake parts under the names Fleetrite and International Harvester. Roman testified that the CED fleet included International trucks and heavy equipment, among other brands.

Bailey testified that he obtained Navistar replacement parts, including brakes, clutches, and gaskets from Gibbs, and Bangs confirmed that Port Hueneme used replacement parts from Gibbs, among a number of other vendors. The Port's fleet included many Navistar vehicles. Bailey recalled seeing Navistar brakes.

Port Hueneme's vehicles were sometimes serviced at Gibbs's facility, and Gibbs would use only International Harvester replacement parts.

Plaintiffs also submitted portions of the deposition of Antonio Villegas, a mechanic at Port Hueneme, who testified that OEM parts were normally used on heavy equipment at the port, and that heavy equipment at the CED was made by a number of manufacturers, including International, Mack, Athey, John Deere, Huff, Sterling, Brockway, Caterpillar, Euclid, GM, and Pettibone. Villegas testified that he frequently saw Lepore in the brake shop.

12

## G. Kelsey-Hayes's Motion for Summary Judgment

Kelsey-Hayes is a manufacturer of brake systems. In support of its motion for summary judgment, Kelsey-Hayes presented evidence that in his deposition,[9] Lepore did not identify Kelsey-Hayes or Fruehauf[10] as the brand, manufacturer, or supplier of any equipment, vehicle, or replacement part that he recalled in connection with his employment at Port Hueneme. Lepore also testified he did not know the brand name or manufacturer of the brakes that were removed from vehicles in his presence or who supplied the brakes or axles on any vehicles he saw repaired.

In his deposition, Bailey identified various brands and manufacturers of vehicles, equipment, and replacement parts that may have been used at Port Hueneme, but he did not recall hearing of Kelsey-Hayes. He believed the Port might have obtained parts for Fruehauf vehicles from Gibbs or White Truck.

Bangs testified that he had heard of Kelsey-Hayes but did not know whether it made any automotive product. He recalled seeing brake work being done on Fruehauf trailers in the CED, but did not know if the components installed were OEM equipment.

Roman testified that he could not identify any particular vehicle that was repaired while he was in Lepore's presence, and could not specify the work that was performed, the maintenance history of the vehicles, or whether the parts removed or installed were original equipment. He had never heard of Kelsey-Hayes or Fruehauf.

Villegas testified that he recalled removing original brakes and gaskets from Fruehauf trailers, but he did not recall whether Lepore was present when he did so. He also testified that Lepore was in the CED "quite often." He did not know whether Lepore was present when he removed or installed a Kelsey-Hayes brake product.

---

[9] Kelsey-Hayes was not a party to Lepore's personal injury action at the time his deposition was taken. In its motion for summary judgment, Kelsey-Hayes contended Lepore's deposition testimony was inadmissible against it because it did not have the opportunity to question him.

[10] There appears to be no dispute for purposes of this motion that Kelsey-Hayes is liable for acts and omissions in connection with Fruehauf vehicles. Fruehauf manufactured and sold trucks with asbestos-containing brake linings.

13

Villegas associated brake parts and components with the name Kelsey-Hayes. He recalled seeing the name Kelsey-Hayes on packaging. He could not recall a particular vehicle for which he removed or installed a Kelsey-Hayes brake product.

**H. Plaintiffs' Opposition to Kelsey-Hayes's Motion**

In opposition to Kelsey-Hayes's motion for summary judgment, plaintiffs submitted evidence that Kelsey-Hayes products were used at the CED throughout the period from 1972 to 1984. Most brake products were arced in the CED. Port Hueneme's fleet included Fruehauf trailers. Port Hueneme continuously bought new trailers, including Fruehauf trailers.

Villegas testified that Lepore was in the brake shop frequently. When asked if he had arced Kelsey-Hayes brand brakes when Lepore was present, Villegas replied, "Yes, we arced a lot in that era." When asked how many times he arced Kelsey-Hayes brand brakes with Lepore present, he replied, "I couldn't tell you the numbers, but we did it on a daily occurrence." When asked how he knew Lepore was present when he arced Kelsey-Hayes brakes, Villegas replied, "Well, I knew him. I seen him all the time," and explained that Lepore visited the shop frequently. He also explained that the CED used Kelsey-Hayes parts frequently. He was asked, "So your testimony that you arced Kelsey-Hayes brand brakes with Mr. Lepore present at times, is that based on your recollection of doing that, or is that based on something else?" Villegas replied, "That's correct, my recollection." He was asked again, "It's based on your recollection?" and he replied, "That is correct." Bangs also answered in the affirmative to the question, "Do you remember Mr. Lepore being present when anyone else was doing any kind of brake work on a Fruehauf trailer between 1973 and 1990?"

**I. Summary Judgment and Motions for New Trial**

The trial court granted summary judgment to all four defendants on the grounds each defendant had met its initial burden and that plaintiffs had failed to present evidence creating a triable issue of fact as to whether Lepore was exposed to asbestos-containing products attributable to defendants.

Plaintiffs filed motions for a new trial as to all four defendants.

14

In support of each new trial motion, plaintiffs submitted the expert declaration of John Templin, an industrial hygienist. In his declaration, Templin explained that once asbestos fibers are released into the air, they remain in the air "for quite some time" before alighting on surfaces. He also opined that "asbestos exposure occurs not only at the time and place of operation, but is known to occur well after the fact by virtue of the fact that asbestos fibers can be suspended and re-suspended for long periods of time. In the field of industrial hygiene, and particularly with respect to asbestos, there is a well-recognized principle called re-entrainment. Re-entrainment describes the phenomenon by which energy imparted by sources such as air movement, vibration, foot traffic, etc. can repeatedly render previously settled dust of very small size or mass airborne again. Re-entrainment can be caused by ordinary movement of people and objects. It can also be caused by air currents. It is caused by disturbances to the environment, such as sweeping, cleaning, blowing down areas, and even just walking through asbestos dust and debris." He continued, "Because of the impact of re-entrainment on asbestos particles in the absence of rigorous containment and clean up methods, it is more likely than not that fibers and particles which are released from asbestos-containing materials in the environment prior to entry by any occupant will continue to contaminate that space."

Moreover, according to Templin, as workers "blew out" their bays, "the [asbestos] fibers would be blown throughout the space to the adjacent bays and beyond. Thus, the dust to which Mr. Lepore and the workers at CED were exposed was not only the dust from a particular job from a particular point in time, but was the dust which was created by all of the workers in sum and total. The dust to which they were exposed was not only from their own work which was performed on particular vehicles on particular days, but was the dust from all the vehicles which were worked on that day and for weeks and months before, since the use of the air hoses would have continuously re-suspended dust from brake jobs and clutch jobs past. [¶] . . . The dust created by the mechanical work traveled throughout the facility. Therefore, not only would Mr. Lepore and the mechanics be exposed to the brake dust from all brake jobs currently being performed, but from those done in the preceding weeks and months." Moreover, he explained,

residual asbestos fibers from previous brake removals can remain present in wheel wells indefinitely and be blown out during later brake jobs. Thus, in his view, Lepore "did not need to be immediately adjacent to such work at the precise moment it was being done in order to be exposed." Based on these factors, as well as the frequency of the work done on defendants' vehicles and equipment and the frequency with which Lepore visited by CED, Templin opined that Lepore was exposed to asbestos from work done on defendants' vehicles and parts.

In support of the new trial motions as to Gibbs and Navistar, plaintiffs also submitted a declaration of Robert Bailey, stating that Gibbs was the Port's main source for International replacement brakes, clutches, and gaskets, and that it was uncommon to use non-OEM replacement parts on International equipment. In support of their motion as to Kelsey-Hayes, they submitted a declaration of Antonio Villegas stating that his recollection that he saw Lepore in the area while Kelsey-Hayes brakes were being arced was based on his own personal observation.

The trial court denied the new trial motions. In doing so, it found the Templin declaration was not "newly discovered evidence" for purposes of Code of Civil Procedure section 657, subdivision (4), because it could have been produced in opposition to the motions for summary judgment. The court likewise found that the declarations of Bailey and Villegas were not newly discovered evidence.

## III.    DISCUSSION

### A. Standards for Asbestos Litigation

"A plaintiff claiming asbestos-related injuries must establish some exposure to the asbestos-containing product or activity for which the defendant is responsible. [Citation.] If there has been no exposure, the plaintiff cannot demonstrate that the defendant caused his or her injuries. [Citation.]" (*Collin v. CalPortland Co.* (2014) 228 Cal.App.4th 582, 589 (*Collin*).) Thus, "[a] threshold issue in asbestos litigation is exposure to the defendant's product. The plaintiff bears the burden of proof on this issue. [Citations.] If there has been no exposure, there is no causation. [Citation.] Plaintiffs may prove causation in an asbestos case by demonstrating that the plaintiff's or decedent's exposure

16

to the defendant's asbestos-containing product in reasonable medical probability was a substantial factor in contributing to the aggregate dose of asbestos the plaintiff or decedent inhaled or ingested, and hence to the risk of developing asbestos-related cancer. [Citation.]" (*McGonnell v. Kaiser Gypsum Co.* (2002) 98 Cal.App.4th 1098, 1103 (*McGonnell*); see *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 976–977.) Direct evidence of exposure is not required; rather, the plaintiff may show from circumstantial evidence that defendant's asbestos-containing product was "sufficiently prevalent" at the work site to warrant an inference that he was exposed to it in the course of his work with or around asbestos. (*Lineaweaver v. Plant Insulation Co.* (1995) 31 Cal.App.4th 1409, 1420 (*Lineaweaver*).)

## B. Ford Shifted the Burden to Plaintiffs

Plaintiffs contend Ford's evidentiary showing was insufficient to shift to them the burden to raise triable issues of fact.

Ford showed that Lepore visited the CED while mechanics performed their work, but that neither Lepore nor anyone else known to plaintiffs could recall a specific vehicle that underwent work or a specific part that was used in Lepore's presence. In its motion, Ford did not dispute that work in the CED, including work with brakes, gaskets, and clutches, could have caused a release of asbestos, and also did not dispute that Ford vehicles were present in the CED. However, Ford showed that mechanics in the CED performed many other types of repairs on vehicles, that they worked on cars, trucks, construction equipment, and trailers made by many different manufacturers, and that replacement parts by many manufacturers, both OEM and aftermarket, were used in the CED.

Plaintiffs draw our attention to no case in which a similar showing has been held insufficient to shift the burden on summary judgment in an asbestos case. As plaintiffs recognize, a defendant can meet its burden on summary judgment by showing, through deposition testimony or the plaintiffs' factually devoid responses to comprehensive discovery justifying an inference of an absence of evidence, that the plaintiffs cannot establish an element of their case. (*Casey v. Perini Corp.* (2012) 206 Cal.App.4th 1222,

17

1228–1231 (*Casey*); *Andrews v. Foster Wheeler LLC* (2006) 138 Cal.App.4th 96, 102–103 (*Andrews*).)

The cases upon which plaintiffs primarily rely are *Casey* and *Andrews*. John Casey, the decedent in *Casey*, worked as a plumber and pipefitter at numerous jobsites, and was later diagnosed with mesothelioma. The defendant, Perini Corporation, had allegedly been the general contractor at three of those jobsites. (*Casey*, *supra*, 206 Cal.App.4th at p. 1225.) Casey's deposition testimony revealed that he did not know if any of the products he used or others used in his presence contained asbestos, he could not identify the brand name, manufacturer, or supplier of any materials that generated dust later swept up or disturbed by Perini workers, and he did not know if the dust to which he was exposed contained asbestos. (*Id*. at pp. 1225–1226.) The plaintiffs' interrogatory responses claimed that Casey had been exposed to asbestos-containing surfacing materials at the jobsites, but never identified the brand name or suppliers of any surfacing materials used at the jobsites, provided no evidence regarding the contents of the construction materials used at the jobsites, and did not identify anyone with knowledge of the contents of such materials. (*Id*. at p. 1226.)

The trial court granted Perini's motion for summary judgment, and this court affirmed the judgment. (*Casey*, *supra*, 206 Cal.App.4th at pp. 1225, 1228.) We reasoned that Casey himself had no knowledge of whether the products used or disturbed in his presence contained asbestos, and that plaintiffs' interrogatory responses did not state "specific facts showing that Casey was actually exposed to asbestos and/or asbestos-containing products due to Perini's activities" and failed to identify the products to which he was exposed or the extent of his exposure. (*Id*. at pp. 1230–1231.) Thus, we concluded, plaintiffs' discovery responses stated in effect that they lacked specific facts supporting their claims, and Perini met its initial burden of presenting evidence to make a prima facie case that there were no triable issues of fact regarding causation. (*Id*. at p. 1231.)

The plaintiffs in *Andrews* alleged that Paul Andrews had been exposed to asbestos from defendant Foster Wheeler LLC's (Foster Wheeler) products. (*Andrews*, *supra*,

18

138 Cal.App.4th at p. 99.) Foster Wheeler moved successfully for summary judgment. (*Ibid.*) Its motion was based on two facts. First, Andrews had admitted in his deposition that he had no knowledge of Foster Wheeler, of having worked with its products, of having been in the presence of anyone working with its products, or of having been exposed to asbestos in connection with its products. (*Ibid.*) Second, in response to special interrogatories seeking all of plaintiffs' knowledge of Andrews's exposure to asbestos from Foster Wheeler products, plaintiffs failed to state specific facts showing Andrews was exposed to asbestos-containing materials from Foster Wheeler's products. (*Id.* at pp. 99, 104–105.) Their responses made general statements that Andrews had been exposed to Foster Wheeler's asbestos-containing boilers in the course of his work on a number of ships, but did not otherwise refer to any Foster Wheeler products or provide any facts known to anyone with knowledge of Andrews's exposure. (*Id.* at pp. 104–105.)

Our colleagues in Division Two of the First Appellate District concluded Foster Wheeler had met its initial burden of production, stating, "As can be seen by this review, plaintiffs answered comprehensive interrogatories by stating in effect that they had no specific facts supporting their claim against Foster Wheeler." (*Andrews*, *supra*, 138 Cal.App.4th at p. 105.) The discovery responses, "devoid of material facts showing that Andrews had been exposed to a Foster Wheeler product," were prima facie evidence that plaintiffs " '[did] not possess, and cannot reasonably obtain, needed evidence' to support their claim. [Citation.]" (*Id.* at pp. 105–106.)

*Collin* is also instructive. The plaintiffs there brought an action against multiple defendants alleging asbestos-related injury, and the trial court granted summary judgment as to four of them. (*Collin*, *supra*, 228 Cal.App.4th at pp. 586–587.) One of the defendants, CalPortland, presented evidence that it manufactured and sold only one asbestos-containing cement product (called Colton gun plastic cement) and that at the same time it also manufactured cement (called plastic cement) that did not contain asbestos. (*Id.* at p. 589.) Plaintiff Loren Collin had testified that he used CalPortland plastic cement and that he did not recall ever seeing the Colton gun plastic cement brand

19

name. (*Id*. at p. 590.) His interrogatory responses averred that he was exposed to " 'CalPortland plastic cement products' " in the course of his work. (*Ibid*.) No other witness identified CalPortland products. (*Ibid*.) This showing, the Court of Appeal concluded, was sufficient to raise an inference that plaintiffs could not prove the element of causation and thereby shift the burden of production to them. (*Id*. at p. 591.)

Another of the defendants in the *Collin* case, Kaiser Gypsum, manufactured an asbestos-containing joint compound from 1959 until early 1976; at that point, it ceased manufacturing and selling any product that contained asbestos, and ceased all manufacturing and sales operations in 1978, although plaintiffs argued it was reasonable to infer Collin could have encountered inventory of the compound for approximately a year later. (*Collin*, *supra*, 228 Cal.App.4th at p. 593.) Thus, according to the plaintiffs, Collin could have been exposed to asbestos-containing Kaiser Gypsum products for 17 years of the approximately 21-year exposure period. (*Ibid*.) In support of its motion for summary judgment, Kaiser Gypsum submitted evidence that it began selling an asbestos-free joint compound in 1974, and that by the end of 1975 it had removed asbestos from all but one joint compound product. (*Id*. at p. 594.) Collin testified that he saw Kaiser Gypsum compound " 'over the years,' " and that on numerous occasions he worked around others who used or sanded Kaiser Gypsum joint compound, cleaned up after using the product was used, and breathed the dust created by such work. However, he did not know whether any of the Kaiser Gypsum products he encountered contained asbestos and he could not identify any particular year he saw Kaiser Gypsum joint compound on a jobsite. (*Ibid*.) He did not know of any documents or witnesses that would show whether he was exposed to asbestos from a Kaiser Gypsum product, and did not know the complete name of any Kaiser Gypsum joint compound product he encountered. (*Ibid*.) His interrogatory responses did not provide any further facts. (*Id*. at pp. 594–595.) This showing, the appellate court concluded, was sufficient to shift the burden on summary judgment on the issue of causation. (*Ibid*.) The court concluded, "Without any fact showing when [Collin] was exposed to Kaiser Gypsum joint

20

compound, the trier of fact could not reasonably infer that [Collin] was more likely than not exposed to asbestos attributable to Kaiser Gypsum. [Citation.]" (*Id*. at p. 596.)

As to two other defendants, J-MM and Formosa, the appellate court concluded they were not entitled to summary judgment on the issue of exposure. (*Collin*, *supra*, 228 Cal.App.4th at pp. 597–600.) Collin had testified that he had worked in the vicinity of other workers who installed, cut or "machined" Transite asbestos cement pipes associated with those defendants during at least a portion of the relevant time period, and there was no evidence he was asked to provide further information about product encounters during that time period and failed to do so. Nor was there evidence other suppliers had supplied the pipes. (*Id*. at pp. 598–599.) Thus, the court concluded, those defendants had not met their initial burden to show the plaintiffs did not possess and could not reasonably obtain needed evidence. (*Id*. at p. 599.)

The facts here are closer to those related to CalPortland and Kaiser Gypsum in the *Collin* case than to those related to J-MM and Formosa. As plaintiffs point out, there is evidence that Lepore was present in the CED while work was being performed on Ford vehicles. The record also shows, however, that many different kinds of work were performed in the CED on many kinds of vehicles. Moreover, no one has testified that Lepore was present while asbestos-releasing work was performed on asbestos-containing Ford products, and plaintiffs' interrogatory responses show they have no knowledge of any further witnesses with pertinent information. Based on Ford's showing, while it is possible that Ford products were a source of the asbestos to which Lepore was exposed, the record is insufficient to allow such a finding by a preponderance of the evidence. We therefore agree with the trial court that Ford shifted the burden of production to plaintiffs.

We are not persuaded otherwise by plaintiffs' argument that Ford failed to meet its burden of showing plaintiffs lacked supporting evidence because it omitted the strongest evidence showing exposure. This evidence, they argue, consisted of Roman's testimony that he and Lepore were "continuously" in the CED and that he was present with Lepore when brake work was being done on Ford vehicles, and that Bailey testified he would order Ford parts for Ford vehicles.

21

The court in *Collin* faced and rejected a similar contention, concluding that a defendant's failure to set forth all material evidence did not necessarily defeat a threshold burden, and that the omission did not appear to be an attempt to mislead the trial court about the state of the discovery record. (*Collin*, *supra*, 228 Cal.App.4th at p. 591.) Similarly here, we cannot say that any omission on Ford's part was an attempt to mislead the court. The evidence Ford submitted in support of its motion made clear that Lepore was present in the CED while mechanics performed brake, clutch, and engine work on Ford vehicles, among many others, and that some of the replacement parts used were Ford parts.[11]

## C. Plaintiffs Met Their Burden

The next question we face is whether plaintiffs met their burden to produce evidence showing a triable issue of fact as to Ford. In considering whether plaintiffs' showing is sufficient to raise a triable issue, we bear in mind that "[i]t is not enough to produce just some evidence. The evidence must be of sufficient quality to allow the trier of fact to find the underlying fact in favor of the party opposing the motion for summary judgment." (*McGonnell*, *supra*, 98 Cal.App.4th at p. 1105.) There, this court concluded that "speculation that at some time [the decedent] might have cut into a wall that might have contained Kaiser joint compound that might have contained asbestos" created "only 'a dwindling stream of probabilities that narrow into conjecture.' [Citation.]" (*Ibid.*)

An example of evidence sufficient to support a reasonable inference of exposure is found in *Lineaweaver*, *supra*, 31 Cal.App.4th 1409. There, our colleagues in Division One of the First Appellate District found the circumstantial evidence sufficient to show that a plaintiff was exposed to a defendant supplier's asbestos-containing insulation where the defendant was the exclusive distributor of Pabco asbestos insulation products, the plaintiff worked with and around asbestos insulation during the relevant time period, insulation covered about two-thirds of the pipes and much of the equipment in the refinery where the plaintiff worked, the plaintiff saw boxes of Pabco products at the

---

[11] We reach the same conclusion as to the other defendants.

22

refinery, the defendant performed about half of the insulating work at the refinery during the 1960's, when the plaintiff worked there, and another major insulator used Pabco products as part of its supplies. (*Id*. at pp. 1419–1420.)

Here, plaintiffs presented evidence that at one point up to 150 pieces of equipment were serviced in the CED on a daily basis, that Ford vehicles were among the many types of vehicles in the fleet, that the work included "re-brak[ing]" the vehicles, that OEM replacement parts were most often used, and that Ford supplied some of the replacement parts. Lepore visited the CED frequently and was present in the CED while vehicles underwent work, including when mechanics used compressed air to clean brake assemblies, creating dust, he was present while brake work was being done on Ford vehicles, and it was "common" for him to be in the vicinity of removal or replacement of brakes, clutches, and gaskets on Ford vehicles.

This evidence is sufficient to raise a triable issue of fact. In considering this issue, we bear in mind our duty to view the evidence "in the light most favorable to the plaintiff as the losing party . . . [and] strictly scrutinize the defendant's evidence and resolve any evidentiary doubts or ambiguities in the plaintiff's favor." (*Barber*, *supra*, 151 Cal.App.4th at p. 1463.) We recognize that mechanics performed many different kinds of work on many different types of vehicles in the CED, that Lepore was never present to view a brake job from start to finish, and that aftermarket replacement parts were used at times. However, there is also direct evidence that Roman was present with Lepore when brake work was being done on Ford vehicles, and that it was "common" for them to be nearby while brakes, gaskets, and clutches were being removed and replaced on Fords. Mechanics would use compressed air to clean brake assemblies within a few feet of Lepore, making the air dusty. Moreover, there is evidence that vehicles were periodically phased out and replaced with new vehicles every few years, and that OEM brakes, clutches, and gaskets were typically used when replacements were necessary. This evidence would be sufficient to allow a trier of fact to conclude Lepore was exposed to

23

asbestos released from products manufactured or distributed by Ford. As a result, Ford is not entitled to summary judgment.[12]

## D. Navistar's Motion for Summary Judgment

The evidence Navistar submitted in support of its motion showed that Lepore could not recall whether he saw work performed on International vehicles and did not know whether the brakes, clutches, or gaskets of any International vehicles he saw at the Port were original. Nor could Bangs or Bailey identify the brand of any piece of equipment that underwent work in Lepore's presence. Both the vehicles and the replacement parts at the CED came from a variety of manufacturers, and aftermarket brakes, gaskets, and clutches were sometimes bought for International vehicles. Roman could not describe by make, model, or maintenance history any International vehicle he saw undergoing brake, clutch, or gasket work while he was in the CED with Lepore, did not know if the material he saw removed was original to the vehicle, did not know the brand name of any brake, clutch, or gasket he saw installed in Lepore's presence, and did not recall seeing International boxes with those parts while he was with Lepore. Plaintiffs' discovery responses noted that Villegas's deposition had not yet taken place, but otherwise did not identify any other witnesses who could testify that Lepore was exposed to asbestos from Navistar or International vehicles or products. As we did with Ford's motion on the basis of a similar showing, we conclude this evidence was sufficient to shift the burden of production to plaintiffs.

Plaintiffs met their burden. In opposition to Navistar's motion, they presented evidence that International and Navistar were among the manufacturers and suppliers of vehicles, equipment, and replacement parts used in the CED, that the CED serviced heavy trucks, construction equipment, and dump trucks made by International, and that approximately a third of the dump trucks in the Port's training fleet were made by

---

[12] Because we reach this conclusion, we need not reach plaintiffs' additional argument that even if there is no evidence from which it could be inferred that Lepore was exposed to asbestos from Ford's new or OEM brakes, Ford should still be held liable because its vehicles required asbestos-containing brake shoes.

International Harvester. There was evidence that the Port had a "consistent" policy of using OEM equipment on heavy duty equipment from the early 1970's through 1984. There was also evidence that brake work was done "all the time" while Roman and Lepore were present, and Roman testified directly that he saw brake work done on wheeled International equipment in Lepore's presence in the CED between 1974 and 1983.

We recognize that this evidence is not overwhelming. As we have already explained, however, we must view the evidence in the light most favorable to the plaintiff. (*Barber*, *supra*, 151 Cal.App.4th at p. 1463.) Viewed in this favorable light, the evidence may be interpreted to show that it is more likely than not that Lepore was present while asbestos-releasing brake work was being performed on Navistar heavy equipment using original or OEM parts. In the circumstances, we conclude summary judgment was not properly granted as to Navistar.

## E. Gibbs's Motion for Summary Judgment

We reach a different conclusion with respect to Gibbs's motion for summary judgment. Gibbs relied on much of the same evidence as did Ford and Navistar. Gibbs also showed that Bailey did not know how often he bought brakes for Navistar vehicles from Gibbs, that he did not know whether Lepore was present when brakes supplied by Gibbs were installed on a Navistar vehicle, that he could not identify a vehicle for which he obtained supplies at Gibbs, and that he could not recall any specific type of gasket he obtained from Gibbs. Lepore's colleague, Roman, could not identify the brands of any replacement parts he saw installed while he was with Lepore. Plaintiffs did not identify any other witnesses than those we have already discussed who might be able to testify to Lepore's exposure to asbestos. This evidence is sufficient to demonstrate that plaintiffs do not have, and cannot reasonably obtain, proof that Lepore was exposed to asbestos released by parts provided by Gibbs, and thus the burden was shifted to plaintiffs to show a triable issue of material fact.

Plaintiffs failed to meet their burden. The evidence they submitted showed that Gibbs sold automotive replacement parts to Port Hueneme, including brakes, clutches,

25

and gaskets, that these parts may have included asbestos-containing brake parts under the names of Fleetright and International Harvester, that Gibbs sometimes serviced Port Hueneme's vehicles and used International replacement parts, and that Villegas frequently saw Lepore in the brake shop. Bailey testified that he obtained Navistar replacement parts from Gibbs. However, Port Hueneme also used replacement parts from a number of other vendors, including Quinn, Catlin's, NAPA, Oxnard Auto Parts, Camarillo Auto Parts, Detricks, Ford, GM, Chrysler, and International. This evidence is insufficient to allow a trier of fact to conclude that it is more likely than not that parts supplied by Gibbs exposed Lepore to asbestos.

Because we have concluded, in our de novo review, that Gibbs met its burden in its initial showing and that plaintiffs failed to raise a triable issue of fact in their opposition, we need not consider plaintiffs' contention that they were deprived of due process by the trial court's reliance on evidence submitted with Gibbs's reply brief.

## F. Kelsey-Hayes's Motion for Summary Judgment

### 1. Evidence Submitted by Parties

In support of its motion, Kelsey-Hayes submitted evidence that Lepore did not identify Kelsey-Hayes or Fruehauf as the maker or supplier of any vehicle or part he encountered in his work at the port, that Bailey did not recall hearing of Kelsey-Hayes, that Bangs did not know whether Kelsey-Hayes made any automotive product, that although Bangs recalled seeing brake work done on Fruehauf trailers in the CED, he did not know if the components were OEM equipment, and that Roman had never heard of Kelsey-Hayes or Fruehauf. Kelsey-Hayes also submitted deposition excerpts in which Villegas testified that he did not know whether Lepore was present when he removed original brakes and gaskets from Fruehauf trailers or when he removed or installed Kelsey-Hayes brake products.

In their opposition, plaintiffs showed that Kelsey-Hayes products were used in the CED, that brake products were arced there, and that the Port continuously bought new trailers, including Fruehauf trailers. Villegas testified that he arced brakes frequently, including Kelsey-Hayes brakes, and that he did so while Lepore was present. When

26

asked how he knew Lepore was present when he arced Kelsey-Hayes brakes, he responded, "Well, I knew him. I seen him all the time." He explained that Lepore went to the CED frequently. After cross-examination, the following exchange took place: "Q. You were just asked how you know that you arced different brand brakes with Mr. Lepore present. [¶] A. That is correct. [¶] . . . [¶] Q. Okay. *So your testimony that you arced Kelsey-Hayes brand brakes with Mr. Lepore present at times, is that based on your recollection of doing that, or is that based on something else?* [¶] [Objection.] [¶] [A.] *That's correct, my recollection.*" (Italics added.) Bangs recalled Lepore being present when brake work was being done on Fruehauf trailers. When asked what he recalled about that, he responded, "I recall several times we used to walk down the hallways [in the CED] when I was in supervision. The trailers would be under—under overhaul, being repaired, being serviced."

In response to this showing, Kelsey-Hayes submitted further excerpts from the depositions of Villegas and Bangs in an effort to show that the testimony plaintiffs relied on was speculative and did not directly link Lepore to any work performed on Fruehauf trailers. The following colloquy took place at Villegas's deposition: "Q. Do you know if Mr. Lepore was present when you ever installed or removed a Kelsey-Hayes brake product? [¶] A. I'm sure he was there when I did a lot of work, yes. [¶] Q. Do you know? . . . [A.] Not at this moment I do not. [¶] Q. Can you think of any other mechanic at this location that you know of that installed or removed a Kelsey-Hayes brake product? [¶] A. I don't know at this moment."

Later in Villegas's deposition, the following exchange took place: "[Q.] Can you tell me whether or not you arced Kelsey-Hayes brand brakes when you worked in the brake shop? [¶] A. Yes, I did. [¶] Q. Can you tell me whether or not at times you arced Kelsey-Hayes brand brakes while Mr. Lepore was present? [¶] . . . [¶] [A.] Yes, we arced a lot in that era. [¶] . . . [¶] Q. . . . Can you tell me the specific number of times that you arced Kelsey-Hayes brand brakes with Mr. Lepore present? [¶] . . . [¶] [A.] I couldn't tell you the numbers, but we did it on a daily occurrence."

27

Later in the deposition, Villegas was asked, "Q. How do you know that [Lepore] was present when you arced a Kelsey-Hayes brake? [¶] A. We had that product in our inventory. We used it quite often. [¶] Q. I understand that. But how do you know it was specifically a Kelsey-Hayes brake you were arcing when Lepore was present? [¶] . . . [¶] A. Because we had that product frequently. We ordered it, we used it, as well as other products. [¶] Q. Was there any product, any brake product in that whole inventory where Lepore wasn't present when you arced a brake? [¶] A. I'm not sure. [¶] Q. So the best answer you can give is how you know Lepore was present when you arced a Kelsey-Hayes brake is that Kelsey-Hayes was in the inventory? [¶] [Objection.] [¶] [Q.] Is that true? [¶] [A.] That's my best answer."

Kelsey-Hayes also submitted additional excerpts of Bangs's deposition. Bangs testified that between 1978 and 1990, he inspected the brakes on a Fruehauf trailer four or five times; when asked if Lepore was present for any of those inspections, he replied, "He was probably in the area, but I—he wasn't with me." He explained that "probably in the area" meant in one of the CED's buildings. He testified that he recalled Lepore being present when others did brake work on a Fruehauf trailer between 1973 and 1990, but upon further questioning, explained that he and Lepore would walk down hallways and that "mixtures of trailers" were being overhauled.

### 2. *Ruling on Kelsey-Hayes's Motion*

At the hearing on Kelsey-Hayes's motion for summary judgment, the trial court indicated that although its role was not to judge credibility, it could properly examine the foundation for a witness's statements. After taking the matter under submission, the trial issued an order granting the motion in which it ruled, without further elaboration, that Kelsey-Hayes sustained its initial burden of production and plaintiffs "failed to present evidence creating a triable issue whether Mr. Lepore was exposed to asbestos-containing products or materials attributable to defendant."

Later, at the hearing on plaintiffs' motion for a new trial, the court stated that it had found Villegas's testimony to be speculative, and in its order denying the motion, the

court found that his deposition testimony "lacked foundation and was speculative in nature."

### 3. Discussion

As we did with the other defendants, we conclude that the evidence Kelsey-Hayes submitted was sufficient to shift the burden to plaintiffs to show a triable issue of material fact that Lepore was exposed to asbestos from Kelsey-Hayes's products.[13] We also conclude that plaintiffs met their burden. Villegas testified that it was his recollection that he arced Kelsey-Hayes brand brakes while Lepore was present. This testimony was unambiguous and was sufficient to support a finding in plaintiffs' favor on this issue.[14]

We recognize that, in its full context, this evidence is not compelling. Villegas also testified that he did not know whether Lepore was present when he removed or installed Kelsey-Hayes brakes or removed original brakes and gaskets from Fruehauf trailers, and that the reason he knew Lepore was present when he arced a Kelsey-Hayes brake was that Kelsey-Hayes was in the inventory. Nevertheless, Villegas's explicit testimony that he recalled arcing Kelsey-Hayes brakes in Lepore's presence is sufficient to create a triable issue of fact on this issue.

---

[13] The basis of Kelsey-Hayes's motion was that plaintiffs could not prove the threshold issue that Lepore was exposed to asbestos from its products, not that he could not show that any exposure was to a reasonable medical probability a substantial factor in contributing to the aggregate dose of asbestos he inhaled or ingested, and hence to his risk of developing asbestos-related disease. (See *McGonnell*, *supra*, 98 Cal.App.4th at p. 1103; *Lineaweaver*, *supra*, 31 Cal.App.4th at pp. 1415–1416.) Accordingly, the only question before us is whether there is evidence that would support a finding that Lepore was exposed to asbestos from Kelsey-Hayes's products.

[14] We recognize that, in ruling on plaintiffs' motion for a new trial, the court found that Villegas's testimony regarding Kelsey-Hayes brakes lacked foundation and was speculative. However, the record does not show that the court excluded the testimony when it ruled on Kelsey-Hayes's motion for summary judgment. Nor did Kelsey-Hayes's written objections to evidence in connection with the motion for summary judgment include an objection to Villegas's deposition testimony.

### G. Motions for New Trial

As we have explained, in denying plaintiffs' new trial motions, the trial court found the declarations submitted in support of the motions were not newly discovered evidence for purposes of Code of Civil Procedure section 657, subdivision (4). Plaintiffs contend the trial court should have admitted the evidence and that the evidence raised triable issues of fact. Because we are reversing the summary judgments in favor of Ford, Navistar, and Kelsey-Hayes, this issue remains only as to Gibbs.

"An order granting summary judgment is properly challenged by a motion for new trial. [Citation.] . . . The new trial motion may seek reversal of the summary judgment on the ground that there are triable issues of fact. [Citation.] In addition, the motion may assert that the summary judgment should be reversed because there is '[n]ewly discovered evidence' (Code Civ. Proc., § 657, [subd. (4)]). [Citation.] [¶] The determinations underlying the new trial order dictate our standard of review. [Citation.] To the extent the order relies on the resolution of a question of law, including the existence of triable issues of fact, we examine the matter de novo. [Citations.] To the extent the order relies on the assertion of newly discovered evidence, we examine the order for an abuse of discretion. [Citation.]" (*Doe v. United Air Lines* (2008) 160 Cal.App.4th 1500, 1504–1505 (*Doe*).) "Generally, when a party seeking a new trial knew, or should have known, about the pertinent evidence before trial but did not exercise due diligence in producing it, the grant of a new trial is error." (*Id.* at p. 1509; accord *Hall v. Goodwill Industries of Southern California* (2011) 193 Cal.App.4th 718, 730–731.)

We discern no abuse of discretion in the trial court's finding that Templin's declaration was not newly discovered evidence. Plaintiffs argue the evidence was "newly discovered" because Gibbs's motion for summary judgment raised only the issue of whether Lepore was exposed to its products. With their reply briefs, plaintiffs contend, defendants submitted additional evidence to support their argument that no witness could state with certainty whether the parts being repaired were original or OEM parts. Templin's declaration, they assert, was intended to address these new challenges by

30

showing that Lepore was exposed to asbestos released from defendants' products even when he was not present during repairs, because that asbestos was released into the CED, spread throughout the CED buildings, and remained there for a lengthy period.

We reject this contention. Gibbs's motion was based squarely on the theory that there was no admissible evidence Lepore was exposed to asbestos from products it distributed or sold. Templin's declaration was intended to show that Lepore was exposed to asbestos from defendants' products even if he was not nearby when asbestos from those products was disturbed. It was directly relevant to the issue of exposure. Nor was Templin's theory unknown to plaintiffs; nearly a year before the summary judgment motions were filed, plaintiffs disclosed their potential expert witnesses; their list included Templin and the disclosure stated that his testimony could include "dustiness" and "re-entrainment." In the circumstances, plaintiffs have failed to show the evidence was newly discovered or that they exercised reasonable diligence in producing it. (*Doe*, *supra*, 160 Cal.App.4th at p. 1509.) The trial court was well within its discretion to conclude the evidence was not newly discovered.

We reach the same conclusion with respect to Bailey declaration. Bailey stated that Gibbs was the Port's main source for International replacement brakes, clutches, and gaskets, and that it was uncommon to use non-OEM replacement parts on International equipment. This evidence was intended to show that Lepore was exposed to asbestos from parts manufactured, supplied, or distributed by Gibbs or Navistar; and, as we have explained, the summary judgment motions directly raised the question of exposure. The time for plaintiffs to produce that evidence was in their opposition to the summary judgment motion, not in support of a motion for a new trial.

## IV. DISPOSITION

The judgment in favor of Gibbs is affirmed. Gibbs shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a).) The judgments in favor of Ford, Navistar, and Kelsey-Hayes are reversed. Plaintiffs shall recover the costs on appeal associated with the judgment for Ford, Navistar, and Kelsey-Hayes. (*Ibid.*)

31

_____
Rivera, J.

We concur:


_____
Ruvolo, P.J.


_____
Reardon, J.

32